# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-00790-COA

LOANMAX, LLC                                             **APPELLANT/ CROSS-APPELLEE**

v.

CASTLE COLUMBUS I, LLC, AS SUCCESSOR-IN-INTEREST TO WENDELTA PROPERTY HOLDINGS, LLC               **APPELLEE/ CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/07/2023 |
| TRIAL JUDGE: | HON. PAULA DRUNGOLE-ELLIS |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | MARK D. HERBERT |
| ATTORNEYS FOR APPELLEE: | JASON ERIC SHARP<br>JOHN D. BRADY |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 02/18/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     LoanMax LLC leased commercial property from Wendelta Property Holdings LLC (Wendelta).  Castle Columbus I, LLC (Castle) later purchased the property from Wendelta, and a dispute arose between LoanMax and Castle concerning the renewal of the lease.[1]  LoanMax initiated an action in the Chancery Court of Oktibbeha County against Castle

---

[1]  Wendelta is not a party in this case.

seeking declaratory and injunctive relief concerning the terms and conditions of the commercial lease pursuant to Mississippi Rules of Civil Procedure 57 and 65. Castle counterclaimed, seeking a declaration that LoanMax failed to properly renew the lease and was in default for failing to maintain the property in accordance with the lease. Castle also sought damages for repair costs, holdover rent, and attorney's fees. The chancellor ruled that LoanMax's attempt to renew the lease was ineffective and ordered LoanMax to surrender the leased premises to Castle. Further, the chancellor found that LoanMax had been paying rent to Castle at the holdover rate and did not owe Castle "back rent". The chancellor also denied Castle's claim for damages, and attorney's fees. LoanMax appealed, and Castle cross-appealed. After reviewing the record, the parties' arguments, and relevant precedent, we affirm in part and reverse and remand in part.

## FACTS AND PROCEDURAL HISTORY

¶2. On August 10, 2009, LoanMax, a lender that provides short-term loans secured by vehicles, entered into a commercial lease with Wendelta for office space located at 102 Highway 12 West in Starkville, which is in Oktibbeha County. On October 3, 2016, Castle purchased the building from Wendelta, and Castle became the successor-in-interest to Wendelta under the lease pursuant to its terms.

### I. The Lease

¶3. When Wendelta leased the property to LoanMax, the initial lease term was for seven years, from August 7, 2009, until August 31, 2016, at $3,500 a month. The lease also provided for two five-year renewals that would potentially extend the lease to August 31,

2

2026. The rent under the lease also increased at a "default rate" of two percent every year, resulting in a total rent of $4,800 per month by the end of the lease's term. According to the lease, LoanMax was required to give Castle 180 days' (six months') notice of its intent to exercise the renewal option. The lease specified that any notice must be sent by "certified mail, return receipt requested, or by Federal Express, United Parcel Service or other overnight delivery service" to each party's respective address, "or to such different address as a party may provide." On October 1, 2019, Castle notified LoanMax via certified mail of its change of address from Columbus to its new address in Starkville. Thereafter, LoanMax was required to send all notices to Castle's Starkville address.[2] Additionally, the lease required a hold-over tenant to pay rent at a rate of 125%. The lease stipulated that the tenant could exercise the renewal option if no "event of default [had] occurred or [was] continuing at the time the tenant exercised their option." Although LoanMax failed to pay rent and ad valorem taxes in 2021, it was not in default of the lease at the time they attempted to renew the lease.

 II.  **LoanMax's Attempt to Renew and Castle's Termination of the Lease**

¶4. LoanMax exercised the first renewal in August 2016 without dispute. On January 29, 2021, Brent Matthews, on behalf of LoanMax,[3] sent Castle a notice of renewal by certified mail. (Matthews also sent a copy of the renewal by email to Mark Castleberry, the founder

---

[2] Castle's address was formerly 412 Main Street, Columbus, MS 39701, but was changed to 600 Russell Street, Suite 185, Starkville, MS 39759.

[3] Matthews left LoanMax for other employment in February 2021.

and CEO of Castle.) However, Matthews mailed the notice to Castle's old address in Columbus, and Castle never received the notice by certified mail. On August 20, 2021, Castle notified LoanMax that it considered LoanMax's notice of renewal invalid, and Castle terminated the lease. Castle also told LoanMax that if LoanMax failed to vacate the premises, it would be considered a holdover tenant and would have to pay rent at a 125% rate.

¶5. On September 17, 2021, Castle entered into a thirty-year lease with Dunkin Donuts. LoanMax, however, still occupied the building. LoanMax, Castle, and Dunkin Donuts agreed that LoanMax would turn over the property in January 2022. During this period, LoanMax continued to pay rent at the "default rate" and not at the holdover-tenant rate of 125%. On December 14, 2021, Castle notified LoanMax that it was terminating the month-to-month holdover tenancy and demanded that LoanMax surrender the premises.

¶6. On December 22, 2021. LoanMax filed its complaint in the Chancery Court of Oktibbeha County. LoanMax requested that the court adjudicate the rights and obligations between the parties under the terms of the lease. Specifically, LoanMax contended that it had properly renewed the lease for the second five-year renewal term. LoanMax also sought injunctive relief to prevent Castle from proceeding with an eviction. Castle answered and counterclaimed, asserting that LoanMax was entitled to no relief and seeking a declaration that the lease expired on its terms and that Castle was entitled to holdover rent from LoanMax as well as damages in the amount of the reasonable costs to replace the roof and to repair or replace the HVAC systems. Castle also sought attorney's fees.

4

¶7.     After discovery, trial began on November 30, 2022, and LoanMax called Mark Castleberry, the sole owner of Castle, as an adverse witness. Castleberry admitted that when he first acquired the building, he made no repairs to the roof or the air conditioning units. Castleberry also testified that he had no knowledge of the condition of the roof or the HVAC units at the time of the lease's effective date when Wendelta first leased the building to LoanMax in 2009. Castleberry also acknowledged that LoanMax paid all outstanding rent and was not in default in the three months leading up to its deadline to renew. Castleberry admitted that he read the January 29, 2021 email Matthew had sent on behalf of LoanMax proposing the additional renewal term.

¶8.     Matthews left LoanMax shortly thereafter, and Jason Baker testified that he became the principal contact between Castle and LoanMax. Baker testified that after Matthews left, some matters concerning LoanMax were "dropped in his lap." One of those matters included the January 29, 2021 renewal notice that was returned to LoanMax by the post office because it was undeliverable. Baker immediately sent an email on March 4, 2021, asking Castleberry if he had received a copy of the renewal notice. Castleberry did not respond to LoanMax's email. On direct examination by Castle, Castleberry recounted the facts above and testified that although LoanMax paid rent after the lease's termination, the amount was not at the rate specified for holdover tenants (125%).

¶9.     Baker, as LoanMax's new corporate representative, testified that he had served as the principal contact between Castle and LoanMax since February 2021. Baker also testified that LoanMax paid for the air conditioning units' quarterly maintenance, inspections, and repairs ranging from "preventative maintenance" to "clogged drains." Baker testified that although

5

Castle claimed LoanMax failed to renew the lease, Castle still accepted the rent payments. LoanMax also introduced a chart detailing all of LoanMax's payments to Castle into evidence.

¶10. Eric Spruill, a business and sales employee of Graham Roofing, testified as an expert in the field of roofing maintenance, repair, and replacement. Spruill recalled that LoanMax requested an inspection around January 2021, but because of a one-month backlog, he inspected LoanMax's roof around March 2021. Upon inspection, Spruill deemed the roof "too far gone" to make any viable repairs, specifically remembering exposed wiring, debris, trash, and water damage. In early August 2021, Spruill inspected LoanMax's roof a second time, and he found the roof in a similar condition as his first inspection. A year later, after Castle terminated LoanMax's lease, Spruill inspected LoanMax's roof a third time and generated an inspection report in which he listed several recommendations for the roof, including a "full tear off" of the roof and HVAC renovations. Spruill testified that the total cost for the new roof would be $99,500.

¶11. Quin Brislin, the vice president and mechanical contractor of Brislin Inc., was accepted as an expert in the field of heating and cooling mechanical services and testified that LoanMax's HVAC units needed repairs totaling $40,000. Lastly, Richard Storey testified as an expert in the field of mold and mold assessment. Storey inspected the building on October 14, 2022, and found mold in the former kitchen area of the building.[4] Storey testified that the mold was most likely the result of the building's water damage caused by

---

[4] LoanMax's office space was primarily the front of an old Wendy's restaurant. LoanMax did not occupy the back half of the restaurant, where the kitchen was located.

6

leaks from the roof.

¶12.   After the hearing, the chancellor identified two issues needing resolution: (1) whether LoanMax had renewed the lease and (2) whether LoanMax was responsible for roofing and HVAC repairs to the leased premises.  Regarding the first issue, the chancellor found that LoanMax failed to renew the lease because neither the January 29, 2021, nor March 4, 2021 emails notifying Castle of LoanMax's desire to renew the lease complied with the notice requirements as set forth in the lease.  The court also ruled that the failure to send the renewal notice was a result of LoanMax's negligence, i.e., sending it to the wrong address after being notified of the correct one.  Therefore, the chancellor found Castle did not waive its notice requirement, and the lease terminated.  The court also mentioned in a footnote that LoanMax had been paying the holdover rent and owed no rent payments to Castle.

¶13.   Regarding the roofing and repairs, the court denied Castle's request for repair and replacement costs because Castle failed to show, per the maintenance provision of the lease, the condition of the roof and HVAC units as they existed in August 2009.  Based on this lack of proof, the court refused to find LoanMax in default and denied Castle's request for reasonable repair and replacement costs.  The court also denied attorney's fees, stating:

> The Court finds that the terms of the Lease does not provide for an award of attorney fees except with regards to LOANMAX's failure to maintain the premises, which claim this Court has denied. Therefore, any request for attorney fees is hereby also denied.

¶14.   LoanMax appealed and argues that Castle's receipt of the renewal notice through email rather than certified mail is not a material breach of the lease.  LoanMax also argues that its failure to send the notice of renewal to the correct address was, at most, a mistake and

7

that equitable relief is appropriate. Lastly, LoanMax contends that strict compliance of the notice provision in the lease is not necessary because Castle received actual notice of LoanMax's desire to renew the lease.

¶15. Castle cross-appealed and argues that the chancellor erred by denying Castle damages for unpaid holdover rent and for LoanMax's failure to maintain the roof and HVAC units. Further, Castle argues that the chancery court abused its discretion in failing to award attorney's fees.

**STANDARD OF REVIEW**

¶16. When a chancellor's findings are supported by substantial evidence, we will not disturb the findings "unless the chancellor abused his discretion, was manifestly wrong, or applied an erroneous legal standard." *Cook v. Vowell*, 394 So. 3d 536, 539 (¶9) (Miss. Ct. App. 2024) (quoting *Wilson v. Greyhound Bus Lins Inc*, 830 So. 2d 1151, 1155 (¶9) (Miss. 2002)). Questions concerning the construction of contracts are questions of law. *McMurphy v. Three Rivers Planning and Dev. Dist. Inc.*, 966 So. 2d 192, 195 (¶12) (Miss. Ct. App. 2007) (quoting *Parkerson v. Smith*, 817 So. 2d 529, 532 (¶7) (Miss. 2002)). Questions of law are reviewed de novo. *Id*.

**DISCUSSION**

**LOANMAX'S DIRECT APPEAL**

I.   **Chancellor's Finding that LoanMax Failed to Renew the Lease**

¶17. An analysis of whether a notice provision has been properly followed begins with the language of the lease. *Kazery v. Wilkinson*, 52 So. 3d 1270, 1276 (¶29) (Miss. Ct. App. 2011). In the case at hand, the lease specified that any notice must be given by "certified

8

mail, return receipt requested, or by Federal Express, United Parcel Service or other overnight delivery service" to the parties at their respective addresses "or to such different address as a party may provide." The lease did not provide any other acceptable manner of notice and did not mention email.

¶18. Our Supreme Court has held that "where an option to renew is expressly conditioned upon a request therefore or notice thereof, it is generally held, in the absence of equitable considerations, that such notice must be given, or the right of renewal cannot be enforced." *Kazery*, 52 So. 3d at 1277 (¶38) (quoting *Koch v. H & S Dev. Co.*, 249 Miss. 590, 622, 163 So. 2d 710, 724 (1964)). However, "there are two exceptions when the renewal clause of a lease need not be strictly complied with to prevent a forfeiture." *Id*. Those two exceptions are:

> (I) Waiver . . . and (II) where the lessee is entitled to and can obtain relief from his failure to give the notice required by the renewal provisions, (1) where by reason of compelling circumstances the failure to give notice results not from lessee's own ignorance or negligence, but (2) from accident, fraud, surprise, or mistake; (3) and the forfeiture will result in a real hardship to lessee, (4) but will do little or no harm to the lessor.

*Id*. The chancery court found that Castle did not waive the notice requirement as set forth in the lease, and LoanMax does not contend that Castle waived notice. Therefore, LoanMax can only be relieved of its obligation to give notice as the lease required if it can provide proof of the elements of the second exception.

¶19. Our Supreme Court has held that "[e]quity will not relieve against "mere forgetfulness and will not intervene where there is no fraud, accident or mistake on account of which the lessee neglected to avail himself of the option." *Koch*, 249 Miss, at 630, 163 So. 2d at 728.

9

This Court has held that if a party's failure to give the required notice "involves a party's own ignorance or negligence, then the trial court must not find a compelling circumstance to warrant equitable relief." *Martin v. Williams*, 172 So. 3d 782, 787 (¶15) (Miss. Ct. App. 2013). In that case, Martin believed that option payments to buy real estate were due by the twenty-first of each month, but later he admitted that he knew this assumption was incorrect. *Id.* When the seller refused Martin's late payment, Martin initiated an action in chancery court, seeking a declaratory judgment, damages, and attorney's fees. *Id.* at 784 (¶1). The chancellor found that Martin failed to timely renew the contract, leading to the expiration of the option period. *Id.* This Court affirmed the chancellor's decision, noting that Martin failed to closely read the contract that he signed. *Id.* We also found that the chancellor did not err in declining to award Martin any equitable relief for untimely renewing his option. *Id.*

¶20. Similarly, the chancellor in the instant case found that LoanMax's failure to send the renewal to the correct address was negligence and found no compelling reason for relief. The chancellor explained that LoanMax sent the notice to the wrong address despite being notified of the address change two years prior. Like in *Martin*, we find no error in the chancellor's ruling.

¶21. LoanMax also contends that mailing the renewal notice to the wrong address was a mistake and did not rise to the level required for a finding of negligence. LoanMax emphasizes that even the chancellor stated in her judgment that LoanMax "*mistakenly* sent the notice to the wrong address in January 2021." (Emphasis added). However, LoanMax knew the correct address for over two years. The record does not reflect that LoanMax sent

any notice, timely or not, to Castle's correct mailing address. Therefore, similar to the appellant in *Martin*, LoanMax failed, without explanation, to acknowledge Castle's change of address or comply with the lease's renewal provisions. We agree with the chancellor's finding that no compelling reason for relief exists.

¶22. LoanMax argues that Castle could only terminate the lease in the event of a material breach of the contract and maintains that its failure to give proper notice of its intent to renew was not a material breach. However, this case does not involve the termination of a lease due to a breach; it involves the automatic expiration of a lease due to non-renewal. Therefore, the case LoanMax cites, *Winters v. Feng*, 320 So. 3d 1235 (Miss Ct. App. 2020), which deals with the differences between material and non-material breaches, is inapplicable. *See id*. at 1243 (¶23).

¶23. Lastly, LoanMax contends that strict compliance with the renewal notice is not necessary because Castle had actual notice by the emails on January 29, 2021, and March 4, 2021. Specifically, LoanMax points to Castleberry's testimony that he received both notices and read them. LoanMax relies on a decision from the United States District Court for the Southern District of Florida, *Tim Hortons USA Inc. v. Singh*, No. 1:16-CV-23041-JG, 2017 WL 1326285 (S.D. Fla. Apr. 5, 2017). In that case, the judge reemphasized well-established Florida law that "[s]trict compliance with a notice provision is unnecessary if a party has actual notice. *Id*. at *8. However, Mississippi's law differs from Florida's. In Mississippi, *Koch* and *Kazery* establish that relief from failing to timely renew in a lease is warranted when a party waived notice or, in the absence of ignorance or negligence, the relief would prevent wrongdoing and hardship. *Kazery*, 52 So. 3d at 1277 (¶38) ("[W]here an option to

11

renew is expressly conditioned upon a request therefor or notice thereof, it is generally held, in the absence of equitable considerations, that such notice must be given." (quoting *Koch*, 249 Miss. at 622, 163 So. 2d at 724)). LoanMax's failure to renew pursuant to the lease's terms does not warrant relief under Mississippi law because Castle did not waive the notice provision, and LoanMax's failure to renew was due to its own negligence. Further, LoanMax knew since the lease's formation in 2009 that all notices were to be given six months in advance by "certified mail, return receipt requested, or by Federal Express, United Parcel Service or other overnight delivery service." LoanMax had previously notified its landlord according to the lease's certified-mail notice provision and successfully renewed the lease without dispute in 2016. Further, nothing in our record shows a mutual communication or agreement by the parties that made actual notice acceptable. LoanMax's argument is an attempt to unilaterally add actual notice to the terms of the lease. Therefore, LoanMax's claim that Castle's actual notice of its intent was sufficient to renew the lease has no merit.

¶24. We find that the chancellor's ruling was not manifestly wrong or clearly erroneous, and the chancellor did not apply an erroneous legal standard; thus, we affirm the trial court's ruling on direct appeal.

## CASTLE'S CROSS-APPEAL

¶25. Castle cross-appeals the trial court's denial of its requests for rent at the holdover rate, damages for LoanMax's failure to maintain the roof and HVAC system, and attorney's fees. Castle points to the lease as the basis for which this relief could be granted. "A party is bound by the plain and unequivocal terms of a contract." *Borries v. Murphy*, 324 So. 3d 261,

12

267 (¶23) (Miss. 2021) (quoting *Alliance Tr. Co. v. Armstrong*, 185 Miss. 148, 186 So. 633, 635 (1939)). When construing contracts, courts should "read the contract as a whole, so as to give effect to all of its clauses." *In re Stewardship of Pub. Tr. Tidelands*, 312 So. 3d 1187, 1191 (¶18) (Miss. 2021). Accordingly, Castle's request for relief depends on what the terms of the lease allow.

## II.     Holdover Rent

¶26.    Throughout the life of the lease, from Wendelta's initial ownership to Castle's acquisition, the rent amount would increase annually by two percent. The lease also had a holdover provision upon termination, which required LoanMax to pay rent at a rate of 125% of the rent when the lease terminated. This Court has reviewed the lease, and Section 31 states:

> If the tenant holds over after the expiration of the Term to earlier termination of the Lease, Tenant shall be a tenant at will and Landlord shall be entitled to terminate the holdover tenancy at any time. During the holdover tenancy, the terms of this Lease shall apply, except that the rent shall be one hundred twenty-five percent of the amount of the rent at the end of the Term.

¶27.    At trial, the chancellor admitted a summary of LoanMax's payments into evidence. This exhibit reveals that pursuant to the lease, LoanMax was required to pay $4,351 monthly, which was the original $3,500 rent increased at the normal two-percent rate over twelve years. The total holdover rent (calculated at 125%) would be $5,439.76 at the termination of the lease. The evidence shows that no payments at the holdover rate were made to Castle. Further, Castle testified that LoanMax never paid rent at the holdover rate. The chancellor acknowledged that holdover rent at the increased amount is required under the lease.

¶28.    Castle argues that the chancellor failed to address the issue of holdover rent.

However, the chancery court's judgment recognized that LoanMax had been paying the rent as a holdover and owed no more rent to Castle. (LoanMax did not respond to Castle's argument in its briefs on appeal.) But our review of the record shows that no holdover rent was paid at the 125% rate. It is clear from the summary of LoanMax's payments that it never paid the holdover rent of $5,439.76 to Castle. Therefore, the chancellor's finding that "LoanMax has been paying the holdover rent amount and as of the date of trial owed no rent monies to Castle" was clearly erroneous and resulted in an abuse of discretion. *See Cook*, 394 So. 3d at 539 (¶9). Accordingly, we reverse this ruling and remand this issue for the chancery court to calculate what, if any, holdover rent is owed to Castle.

### III. Damages for LoanMax's Alleged Failure to Maintain the Premises

¶29. Castle also argues that the chancellor erred in finding that LoanMax was not in default for failure to maintain the roof and HVAC units. LoanMax counters that the chancellor correctly held that Castle failed to prove the condition of the roof and the HVAC units at the beginning of the lease or when Castle purchased the property in 2016. On this issue, our review of the record confirms the chancery court's ruling was not erroneous.

¶30. To prevail on a breach-of-contract claim, a plaintiff has the burden of proving by a preponderance of the evidence "(1) that a valid and binding contract exists; and (2) that the defendant has broken or breached it without regard to the remedy sought or the actual damage sustained." *Norman v. Anderson Reg'l Med. Ctr.*, 262 So. 3d 520, 527 (¶27) (Miss. 2019). In this case, the lease stated:

> Tenant shall have the sole obligation to maintain the property in the same condition as it exists on the Effective Date, except for ordinary wear and tear, and shall make all repairs and replacements of every kind and necessary to

keep the Leased premises in this condition during the Term.

The chancellor found that Castle did not put on sufficient proof to hold LoanMax in default, specifically stating:

> Of particular importance to the Court is the following language contained in the Maintenance provisions of the Lease: "LOANMAX shall have the sole obligation to maintain the property in the same condition as it exists in August 2009." CASTLE offered several witnesses as to the present condition of the roof and HVAC units but no proof as to the condition of the roof and HVAC units as they existed in August 2009. Additionally, there was no credible proof as to the age of the roof and HVAC units or as to how the same has changed while under lease with LOANMAX. Mark Castleberry testified that he only inspected the property when he purchased the same in 2016. No other testimony was offered for which this Court could credibly determine the condition of the roof in August 2009 and how the same improved, deteriorated or possibly just stayed the same while under lease with LOANMAX.

Based upon our review of the record, a valid and binding contract existed between LoanMax and Castle, and Castle failed to prove that it was breached. Castleberry presented no evidence showing the condition of the roof and the age of the HVAC units in 2009 when Wendelta leased the property to LoanMax, nor did Castleberry present any evidence of the *condition* of the roof when he inspected the property in 2016. Further, Castle offered no legal authority to suggest that it was entitled to damages despite the lack of proof of its maintenance claim. Finding no error, we affirm the chancery court's findings on this issue.

### IV. Castle's Request for Attorney's Fees

¶31. Lastly, Castle contends that the chancellor abused her discretion in finding that Castle was not entitled to attorney's fees. LoanMax argues that any claim for attorney's fees were no longer warranted because the chancellor denied Castle's request for damages related to maintenance of the roof and HVAC units and the roof. The chancellor reasoned that no other

15

provisions were in the lease that entitled Castle to attorney's fees.

¶32. On appeal, Castle claims that other provisions in the lease provided for attorney's fees and warranted relief. The lease references attorney's fees under three separate provisions—maintenance, taxes, and "Remedies Upon Default."[5] Castle's only viable claim for attorney's fees would be under the Remedies Upon Default provision.

¶33. "Attorney's fees are a special remedy available only when expressly provided for in either a statute or contract, or when there is sufficient proof to award punitive damages." *Norman*, 262 So. 3d at 527 (¶25). Here, the chancellor denied Castle attorney's fees because the maintenance provision was the only provision in the lease that provided for attorney's fees, and the chancellor had already denied Castle's claim for damages regarding the maintenance provision. Castle specifically argues that subsection three of the lease's Remedies Upon Default provision warranted payment of attorney's fees and cites the following portion of section 27(a)(iii):

> Tenant agrees to pay Landlord, as additional rent, immediately upon demand, all reasonable expenses incurred by Landlord in obtaining possession, in performing alterations and in reletting any of the Leased premises, including fees and commissions of attorneys, architects, agents and brokers.

¶34. However, not only does Castle take this language out of context, the entirety of section 27 in the lease applies to a very specific and limited circumstance: "Remedies Upon Default." This section applies when a party defaults as specified in section 26 of the lease and the landlord takes possession. In this case, there was no default by LoanMax; the lease simply expired due to LoanMax's failure to properly renew it. Therefore, the provision for

---

[5] Castle did not raise any issues of failure to pay ad valorem taxes on appeal.

16

attorney's fees in section 27 of the lease does not apply. Accordingly, Castle's argument for attorney's fees under this provision has no merit.

## CONCLUSION

¶35. We affirm the chancellor's ruling as reviewed on LoanMax's direct appeal. LoanMax did not provide the notice required to effectively renew the lease. As to Castle's cross-appeal, we affirm the chancellor's ruling that Castle is not entitled to any damages for the roofing and HVAC units or attorney's fees. However, we find that the chancellor erred in her findings concerning holdover rent, and we reverse the judgment in part and remand the case for the chancery court to reassess what, if any, back rent LoanMax may owe Castle when calculated at the holdover rental rate of 125%. Therefore, we affirm the final judgment in part and reverse and remand in part.

¶36. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. BARNES, C.J., NOT PARTICIPATING.**